UNITES STATE DISTRICT COURT
FOR THE DISTRICR OF SOUTH DAKOTA
NORTHERN DIVISON

| | |
|---|---|
| KYLIE SCHULTE, <br><br> Plaintiff, <br><br> vs. <br><br> EVANGELICAL LUTHERAN GOOD SAMARITAN SOCIETY, <br><br> Defendant. | 1:18-cv-1016 <br><br> **COMPLAINT** <br> (Jury Trial Demanded) |

COMES NOW Plaintiff Kylie Schulte, and for her Complaint against Defendant Evangelical Lutheran Good Samaritan Society, states and alleges as follows:

### JURISDICTION, VENUE AND PARTIES

1) This a disability discrimination action arising under Title I of the Americans with Disabilities Act of 1990, and the ADA Amendments Act of 2008 ("ADAAA"), codified at 42 U.S.C.A. § 12102.

2) This Court has jurisdiction over Plaintiff's discrimination claims pursuant to 42 U.S.C.§2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343(a)(4).

3) Venue is proper in accordance with 28 U.S.C. § 139l(b) and 42 U.S.C. §2000e-5(f)(3).

4) Plaintiff Kylie Schulte ("Schulte") is an adult resident of Deuel County, South Dakota.

5) Defendant Evangelical Lutheran Good Samaritan Society does business as the Good Samaritan Society – Deuel County in Clear Lake, South Dakota, and is an "employer" subject to the ADA and the ADAAA.

1

6) Schulte timely filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 29, 2017. On February 16, 2018, Schulte received a Notice of Right to Sue dated February 13, 2018 from the EEOC.

## GENERAL ALLEGATIONS

7) Evangelical Lutheran Good Samaritan Society d/b/a Good Samaritan Society – Deuel County ("GSS") provides a variety of senior services, including long-term nursing home care, in Clear Lake, South Dakota.

8) On or about September 27, 2013, GSS employed Schulte as an aide in its Clear Lake nursing home facility.

9) Schulte has impairment that qualifies as a disability within the meaning of the ADA.

10) Schulte has a record of having a disability within the meaning of the ADA.

11) Schulte's impairment has substantially limited one or more of Schulte's major life activities including her ability to stand, walk, lift and her ability to concentrate, remember and process information.

12) Schulte performed work assignments in at least two departments at GSS during her employment, including the role of dietary assistant and working in the laundry department.

13) Schulte performed her work assignments at GSS in a manner that met her employer's expectations.

14) When Schulte returned from a brief medical leave in June 2016, one of her co-workers and her direct supervisor Scott Bjerke began harassing her about how slow she was and how she did not perform at the pace they wanted.

15) In July 2016, Schulte made an internal hostile work environment claim to a GSS facility social worker, who arranged a mediation to improve Schulte's work environment and eliminate the harassing and bullying behavior that Schulte was complaining about.

16) After the mediation on her hostile work environment claim, Bjerke and Schulte's co-worker refused to communicate with her and eventually returned to making comments about her ability to perform at the speed they arbitrarily expected.

17) On July 29, 2016, Schulte's physician recommended a leave of absence for medical reasons. He documented that Schulte had a disability that caused her to have hypervigilance with people who make fun of her, and that a workplace free from bullying and harassment was not only necessary for Schulte but a matter of federal law.

18) Schulte's FMLA leave request was granted based upon her physician's request.

19) When Schulte told Bjerke about her leave of absence request, he asked, "Is that your resignation?" When Schulte advised him that she was merely requesting a medical leave with documentation from her physician, Bjerke became visibly irritated.

20) The following day, Bjerke texted Schulte that she needed to delete his phone number and could only communicate with him in accordance with the facility employee handbook from that point on.

21) Schulte is not aware of any other GSS employee who was not permitted to communicate with a direct supervisor by phone.

22) On August 11, 2016, Schulte's physician completed GSS' FMLA form outlining Schulte's need for a few more days of FMLA leave and reasonable accommodation upon her return to work. Specifically, the physician stated that Schulte required a medical leave of absence for depression and anxiety, but could return to work on August 22, 2016 with reasonable

3

accommodation: the reasonable accommodation suggested was that Schulte be protected from harassment and bullying.

23) Harassment and bullying are prohibited by GSS policy, so this was not an unreasonable accommodation request.

24) GSS has acknowledged that Schulte's job was one which could be subject to reasonable accommodations.

25) On August 19, 2016, Schulte's physician again updated Schulte's FMLA leave form and informed GSS that Schulte had a neurological disability and could return to work on August 22, 2016 if provided with a non-hostile workplace with no harassment about working too slowly or and without being asked to work outside of the job description.

26) On August 23, 2016, Schulte made a formal request for accommodation for her neurological disability, in which she requested to be permitted to work at a slower pace and not to be ridiculed about her speed by her supervisor Scott Bjerke and her co-worker in the laundry department. Alternatively, she asked to be transferred to a different position in order to avoid contact with her two harassers.

27) Accommodating Schulte per her physician's statement would not have placed an undue hardship upon GSS because bullying and harassing behavior is prohibited by its policies as well as federal and state law.

28) On August 23, 2016, GSS represented that Schulte's requests for accommodation would be met and that the pace of her work as she was performing was acceptable. It declined to transfer to her a different department where she would not be supervised by Bjerke or work with her harassing co-worker.

29) After her accommodation request, Bjerke and Schulte's harassing co-worker collaborated to continue to belittle and bully Schulte even though both were aware of her emotional health issues, her sensitivity to harassment and bullying, and her related accommodations.

30) On September 14, 2016, Bjerke drafted a "coaching and counseling" disciplinary warning to Schulte for allegedly engaging in "inconsiderate treatment" of the co-worker who was bullying her.

31) On or about January 3, 2017, Schulte wrote a letter to the GSS National Campus in Sioux Falls to report that her hostile work environment claims were not being addressed by the GSS administration at the Deuel County facility.

32) On January 3, 2017, Bjerke suspended Schulte from work for alleged "inconsiderate treatment" of co-workers.

33) On January 5, 2017, Bjerke issued a final written warning to Schulte for alleged "inconsiderate treatment."

34) GSS responded to Schulte's complaint of discrimination, harassment and retaliation by advising her to complete a "Fair Treatment" form and provide it to her supervisor, Bjerke. GSS also asserted that her accommodation requests were being met.

35) GSS did not seriously investigate Schulte's January 2017 complaints of harassment, discrimination and failure to accommodate.

36) When Schulte returned from a medical leave after a surgery in March 2017, Bjerke and Schulte's harassing co-worker intentionally set up a work assignment and instructed Schulte to lift the heavy end of a laundry tote. When Schulte objected that it weighed more than 20 pounds and she was not able to safely lift it, Bjerke stated that Schulte had to do as directed or she would be fired for insubordination. Bjerke hollered and became

obviously angry at Schulte, and told her that he had already gotten approval from the facility administrator to assign her to that job duty.

37) Lifting more than 20 pounds is not a regular requirement for Schulte's job, and Bjerke intentionally designed a work assignment in order to force Schulte into lifting following her medical procedure in an effort to cause her to take further medical leave, to get her to quit out of frustration, or be insubordinate so that he could fire her.

38) Schulte asked to see the facility administrator and Bjerke then followed Schulte to the GSS Human Resources manager's office, where both Bjerke and the Human Resource manager told Schulte that her "only" options were to take another FMLA or to resign if she did not want to lift the heavy tote.

39) Schulte began crying and asked the GSS Human Resources manager if there was any other option for her beside FLMA leave. The Human Resources manager refused her accommodation request and insisted that Schulte apply for FMLA leave.

40) GSS managerial employees regarded Schulte as having a serious medical condition that qualified her for FMLA leave.

41) GSS approved the FMLA leave that it had insisted upon from March 27, 2017 until April 10, 2017 based on its perception of her serious medical condition.

42) On March 27, 2017, even though she was approved for FMLA leave until April 10, 2017, Bjerke issued a final written warning terminating Schulte for alleged "inconsiderate treatment" of himself and the co-worker who had been harassing Schulte.

43) When Schulte returned to work on April 10, 2017, she was called into the facility administrator's office, where Bjerke and the administrator terminated her employment. They refused to provide a reason for her termination but told her that she was not permitted to

return to the premises even if she was only coming to visit residents.

### COUNT I: VIOLATION OF TITLE I OF THE ADA AND ADAAA
**(Disability Discrimination – Failure to Accommodate and Hostile Work Environment)**

44) Plaintiff realleges the allegations in Paragraphs 1-43 above.

45) Defendant GSS is a covered employer as contemplated by 42 U.S.C. § 12111(5)(A).

46) Schulte was at all times relevant to this action "disabled" as contemplated by 42 U.S.C. § 12102.

47) GSS knew of Schulte's disability.

48) GSS managerial staff perceived Schulte to be a person with a disability.

49) Schulte was able to perform the essential functions of her positions at GSS.

50) Schulte and her physician made repeated, reasonable accommodation requests for Schulte's disability beginning in July 29, 2016.

51) Schulte's accommodation requests were not unduly burdensome or unreasonable.

52) Schulte's direct supervisor and other GSS staff were aware of Schulte's disability and her sensitivity to harassing and bullying commentary.

53) Schulte's direct supervisor and other GSS staff created a hostile work environment by intentionally subjecting Schulte to demeaning, insensitive and harassing commentary because of her disability.

54) GSS, through its Deuel County facility management, failed to provide reasonable accommodations despite Schulte's repeated requests for reasonable accommodations and her physician's explicit documentation of her need for accommodation.

55) GSS tolerated and subjected Schulte to a hostile work environment because she has a disability.

56) Other employees who engaged in the same or similar behavior who did not have Schulte's

disability status were treated more favorably than Schulte in terms of disciplinary action, hours, job duties and work environment.

57) GSS, through its Deuel County facility management, treated Schulte unfavorably in terms of disciplinary actions because she has a disability.

58) GSS, through its Deuel County facility management, treated Schulte unfavorably in terms of her hours and job duties because she has a disability.

59) Schulte has been exposed to ridicule, humiliation and embarrassment because of her supervisors' perception of her disability status and their tolerance of bullying and demeaning comments related to her disability status.

60) Schulte has been exposed to ridicule, humiliation and embarrassment because of her employer's refusal to accommodate her requests to provide her with a work environment free of harassment and ridicule about her disability.

61) Schulte suffered adverse employment actions when GSS reduced her hours and job duties and when GSS terminated her employment.

62) GSS terminated Schulte because of her disability.

63) GSS's proffered reasons for refusing to accommodate and to discipline and terminate Schulte are pretextual.

64) To the best of Plaintiff's knowledge, GSS replaced Schulte with an employee who did not require accommodation.

65) As a direct and proximate result of GSS's refusal to accommodate Schulte, Schulte has suffered embarrassment, humiliation and mental anguish.

66) As a direct and proximate result of GSS's discriminatory action, Schulte has sustained lost income, lost employment-related benefits and a diminishment in her future

8

vocational opportunities.

67) But for GSS's discriminatory treatment, Schulte intended to continue employment with GSS.

68) The unlawful employment practices complained of in Count One were willful, reckless and malicious.

### COUNT II: VIOLATION OF TITLE I OF THE ADA AND ADAAA
**(Retaliation for Protected Activity)**

69) Plaintiff reasserts the allegations of Paragraphs 1-68 above.

70) Plaintiff engaged in protected activity when she and her physician requested accommodation for her disability beginning on July 29, 2016.

71) Plaintiff engaged in protected activity when she repeatedly reported a hostile work environment and harassment based upon disability status beginning on July 29, 2016.

72) GSS's disciplinary actions, reduction of work hours, change in job duties, and termination are adverse employment actions.

73) Plaintiff's disciplinary actions within a relatively short period after her protected activity are causally linked to her opposition to discriminatory treatment.

74) Plaintiff's termination within a relatively short period after her protected activity are causally linked to her opposition to discriminatory treatment.

75) GSS's proffered reasons for disciplining and terminating Schulte are pretextual and contrary to written GSS policy.

76) To the best of Plaintiff's knowledge, GSS replaced Schulte with an employee who did not require accommodation.

77) As a direct and proximate result of GSS's retaliatory actions, Schulte has suffered embarrassment, humiliation and mental anguish.

78) As a direct and proximate result of GSS's retaliatory actions, Schulte has sustained lost income, lost employment-related benefits and a diminishment in her future vocational opportunities.

79) But for GSS's discriminatory treatment, Schulte intended to continue employment with GSS.

80) The unlawful employment practices complained of in Count One were willful, reckless and malicious.

## REQUESTS FOR RELIEF

Plaintiff Kylie Schulte requests and prays for judgment against Defendant Evangelical Good Samaritan Society as follows:

1) For an award sufficient to compensate her for all special and general damages as allowed by the ADA and the ADAA, including front pay in lieu of reinstatement;

2) For punitive damages to be determined by the jury;

3) For her reasonable attorney fees, costs, disbursements and expenses incurred in the pursuit of this matter;

4) For a trial by jury; and

5) For such other and further relief as the Court may deem just and appropriate.

Dated this 10th day of May, 2018.

JOHNSON POCHOP & BARTLING

_____
Stephanie E. Pochop
405 Main Street | PO Box 149
Gregory, SD 57533
(605) 835-8391
Stephanie@Rosebudlaw.com
*Attorney for Plaintiff Kylie Schulte*